**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION



| | | |
|---|---|---|
| **IJEOMA EKERUO,** | § | |
| *Plaintiff* | § | |
| | § | |
| | § | |
| **VS.** | § | Case No. |
| | § | |
| | § | **JURY DEMANDED** |
| **THE UNIVERSITY OF TEXAS** | § | |
| **HEALTH SCIENCE CENTER AT** | § | |
| **HOUSTON; THE UNIVERSITY OF** | § | |
| **TEXAS SYSTEM; RAMESH** | § | |
| **HARIHARAN, MD; AND DAVID** | § | |
| **MCPHERSON, MD.** | § | |
| *Defendants* | § | |
| | § | |
| | § | |

**COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Ijeoma Ekeruo, MD ("Plaintiff" or "Dr. Ekeruo") presents this Complaint for unlawful discrimination and retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., ("Title VII"); and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) et seq., ("EPA").

## NATURE OF THE ACTION

1.  Plaintiff brings the action against defendants The University of Texas Health Science Center at Houston ("UT Health Houston"), The University of Texas System ("UT System", and together with UT Health Houston, the "University"), Ramesh Hariharan, MD ("Hariharan"), and David McPherson, MD ("McPherson", and collectively, the "Defendants"), to redress a pattern and practice of unlawful employment discrimination on the basis of race, national origin, and sex.

2.  Plaintiff also brings this action to assert claims of unlawful retaliation for, among other things, her reporting and actively opposing unlawful discrimination in the workplace.

3.  Plaintiff is a member of at least three protected classes because she is a Nigerian American, and she is a black woman. Plaintiff was an employee of Defendants who was subjected to one or more aspects of systemic unlawful discrimination on the basis of her race, national origin, and sex, including, but not limited to: discriminatory policies, practices, behaviors and procedures; pay unequal to her comparative male, non-black, and non-Nigerian American colleagues; defamation; termination; differential treatment; and hostility in the workplace.

4.  After reporting and actively opposing unlawful discrimination in the workplace, Defendants retaliated against Plaintiff by subjecting her to unfavorable terms and conditions of employment, defamation, and terminating her employment.

5.  Plaintiff seeks declaratory and injunctive relief; back pay; front pay; compensatory, nominal and punitive damages; and reasonable attorneys' fees, interest, costs and expenses to redress Defendants' unlawful discriminatory and retaliatory policies, practices and procedures.

## PARTIES

6.  Plaintiff Ijeoma Ekeruo resides in Texas. Defendant UT Health Houston does business in the State of Texas, and has a principal office located at 7000 Fannin, Suite 1460, Houston, Texas 77030, within this judicial district. Defendant UT System does business in the State of Texas, and has a principal office located at 210 West 7th Street, Austin, Texas 78701. Defendant Ramesh Hariharan, is a natural person who resides in Texas. Defendant David McPherson is a natural person who resides in Texas.

## JURISDICTION AND VENUE

7.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331. This is a discrimination suit authorized and instituted pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, as amended, 42 U.SC. § 2000e et seq., and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) et seq.

8.   Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c) because Defendants are subject to personal jurisdiction in Texas.

9.   The Southern District of Texas is the most logical forum in which to litigate the claims of Plaintiff. Plaintiff worked at the University's facility in Harris County, and many of the discriminatory and retaliatory practices alleged to be unlawful were committed in Harris County, Texas.

## FACTS COMMON TO ALL COUNTS

10. As alleged with greater particularity below, Defendants, jointly and severally, discriminated against Plaintiff on the basis of her race (black), national origin (Nigerian American), and sex (female), by, among other things: treating her differently from and less preferably than similarly situated male, non-Nigerian American, and non-black employees; subjecting her to disparate terms and conditions of employment; subjecting her to pay unequal to her comparative male, non-black, and non-Nigerian American colleagues; subjecting her to a hostile work environment; defamation; and, eventually, terminating her employment.  These acts and omissions occurred during the period Juluy 2016 through September 2024, inclusive.

11. After reporting and opposing unlawful discrimination in the workplace, Defendants retaliated against Plaintiff by subjecting her to unfavorable terms and conditions of employment, defamation, and terminating her employment. These reports started about April 2019 and continued through September 2024.

12. The discrimination and retaliation described in this Complaint was systemic, and it was continuing in nature.

13. Defendants, jointly and severally, engaged in a pattern and practice of discrimination and retaliation against Plaintiff.

14. During her employment, Dr. Ekeruo worked for the institutional Defendants, first as an Assistant Professor, and then was promoted to an Associate Professor, and was a practicing cardiac electrophysiologist within the division of cardiology.  Dr. Ekeruo was employed by the institutional Defendants from July 2016, until September 2024, when her employment was involuntarily terminated by them or either of them.

15. Dr. Ekeruo's background is a blend of exceptional educational credentials and extensive professional experience.   She is, in short, a distinguished educator and medical doctor.

16. Plaintiff graduated summa cum laude from Spelman College, a renowned historically black university in Atlanta, Georgia in May 2001. She also holds an MD degree from Emory University School of Medicine, another distinguished institution also located in that city.  She was awarded her MD degree during May 2016.

17. Following college and graduate school, Plaintiff did her post graduate residency and fellowship at the University and is a well-qualified a cardiac electrophysiologist.

18. During all relevant times, Dr. Ekeruo  was the only black female cardiac electrophysiologist in the entire State of Texas.

19. Moreover, Dr. Ekeruo has received countless honors through the course of her education and career. Most recently, she was awarded the Dean's Teaching Award (2024) and the Growth and Leadership for Black Electrophysiologists Award (2023-2024).

20. She also is affiliated with several local, national, and international professional organizations, and has been published in several respected academic journals.

21. The University has a notorious track record of unlawful discrimination against certain groups of people. Most recently, Professor Evdokia Nikolova prevailed in a lawsuit against the University of Texas for sex and pregnancy discrimination.

22. When Dr. Ekeruo began her employment in 2016, she was assigned to the cardiac electrophysiology department, led by Hariharan.

23. Hariharan systematically and meticulously targeted Dr. Ekeruo and subjected her to ongoing discrimination and mistreatment starting when she began her employment.

24. Hariharan's personal campaign of discrimination against Plaintiff began in 2016 and the negative impact on Dr. Ekeruo continues to burden her.  He engaged in these practices while he was an employee and agent of one or both of the institutional Defendants.

25. Upon joining Hariharan's department, he immediately declared – announced – that Dr. Ekeruo would be treated differently than all the other cardiac electrophysiologists ("EPs").

26. Unlike Plaintiff's white peers and counterparts, Hariharan refused to assign her a territory where she could take call; he refused to allow her to take consults; he refused to allow her to operate her own clinic; and he steadfastly refused to allow her to obtain hospital privileges outside of Lyndon B. Johnson Hospital and Memorial Hermann Texas Medical Center.

27. Hariharan severely restricted Dr. Ekeruo's work responsibilities and, unlike others, only permitted her to work at his clinic and perform procedures on his patients.

28. This was a stark difference in the way Hariharan supervised and treated the other EPs.

29. The other EPs were assigned to a specific territory (north, south or west) where they took calls and had consults; they operated their own clinics up to three days per week; and they were permitted by Hariharan to obtain privileges at several different hospitals.

30. This unlawful discrimination had immediate negative consequences for Dr. Ekeruo. Firstly, because Dr. Ekeruo was not permitted to take calls or operate her own clinic, she was unable to build the clinical volume that was critical for her to meet her yearly work RVU goals and "pay for her salary", a fact that was later used as justification for her removal.

31. As the head of the department, Hariharan was well aware that the severe limitations he placed on Dr. Ekeruo's ability to work would harm and impair her standing and reputation in the academic and medical communities. Simply put, Hariharan intentionally sought to derail the budding career of Dr. Ekeruo, a black woman.

32. Additionally, Dr. Ekeruo's salary was not comparable to her male, non-black, and non-Nigerian American peers. Hariharan played a significant role in setting Plaintiff's annual compensation.

33. Dr. Ekeruo was the lowest paid EP employed by the institutional Defendants, during the relevant time.

34. Beginning in 2016, Hariharan (with the approval of Human Resources representatives) set Dr. Ekeruo's base salary at $290,000 with no quarterly bonuses, while other EPs were paid a base salary of at least $400,000 plus quarterly bonuses.

35. After speaking with several colleagues about their salaries, Dr. Ekeruo discovered that some of her peers were making quarterly bonuses of up to $300,000, during the relevant period.

36. This pay disparity is remarkable by any standard. A significant chasm existed between a black woman's compensation and the compensation of her non-black and non-Nigerian American peers.

37. On several occasions, Dr. Ekeruo questioned Hariharan about the pay disparity and asked for her compensation to be increased equal to that of her peers, but Hariharan, a racist, refused to offer any explanation.

38. Hariharan indicated that he would not increase Dr. Ekeruo's base compensation because she was not assigned to a territory, and that she would not receive quarterly bonuses because her work RVUs were too low. Hariharan was using the discriminatory work restrictions that he personally designed to justify paying Dr. Ekeruo less money than her peers.

39. Hariharan personally enjoyed substantial financial benefits based on Dr. Ekeruo's efforts in the workplace.

40. Dr. Ekeruo performed a substantial number of medical procedures for Hariharan but received zero credit of any kind for those procedures. Based on his activities and directions over the years, it appears that Hariharan intended to convert Plaintiff into her personal servant in the workplace with the full knowledge and consent of the institutional Defendants.

41. None of those procedures were counted towards Dr. Ekeruo's annual work RVU goals; she did not receive bonuses or an increase in her base compensation for the work that she was performing. Instead, all the procedures that she performed actually were credited to Hariharan, and he received all of the compensation for those procedures.

42. This behavior by Hariharan and those acting in concert with him is tantamount to slavery and virtual bondage. Without using whips and chains, Hariharan consistently forced a black woman to perform his work without appropriate compensation and he reserved all the benefits of her efforts for himself. This arrangement is not acceptable nor is it standard in the sector. With respect to these unlawful and corrupt activities, the institutional Defendants failed or neglected to supervise, restrain and oversee Hariharan.

43. And, to add insult to injury, during, about February 2019, one of Dr. Ekeruo's performance reviews, Hariharan boldly announced that Dr. Ekeruo needed to increase her work RVUs, despite the fact that he was directly benefitting from her work.

44. Upon discovery of this scheme orchestrated by Hariharan, Dr. Ekeruo immediately sought to increase her work RVUs and was able to obtain the support of Dr. Saumya Sharma, the head of the south territory.

45. Beginning in October 2017, Dr. Ekeruo discussed the work limitations that were placed on her, and Dr. Sharma was puzzled and confused because other EPs did not have the same limitations.

46. Dr. Sharma then offered Plaintiff a position in the south territory to take calls and instructed her to begin a clinic on the same day that he held his clinic. Dr. Ekeruo accepted the offer and complied with the instruction.

47. However, when Hariharan was made aware that Dr. Ekeruo would be taking calls in the south territory and operating her own clinic, he objected and immediately terminated her involvement in the south territory.

48. Dr. Sharma informed Dr. Ekeruo that because of Hariharan's objection that she could no longer take calls as proposed in the south territory.

49. At this point, namely during 2018, it became clear to Dr. Ekeruo that Hariharan's intentions were to stifle her career, punish her, and continue to interfere with her efforts to increase her productivity and standing at the University. Hariharan wanted Plaintiff, a black woman, to work, in effect, as his lackey and servant – unlike others.

50. Eventually, after several doctors in the department resigned from their positions with the institutional Defendants, during 2018 (two years after Dr. Ekeruo first requested to be assigned to a territory like her peers), Hariharan offered Dr. Ekeruo a position in the north territory.

51. More than two years passed before Hariharan decided to assign Dr. Ekeruo to a territory.

52. Keenly aware of the discriminatory animus that Hariharan held against her, from the beginning, Dr. Ekeruo declined the position in the north territory due to fears of continued discrimination, harassment and servitude by Hariharan.

53. However, about two weeks later, namely about March 2018, she reluctantly accepted the assignment in the north territory.

54. Dr. Ekeruo was then informed, about March 2018, that since she was finally being assigned to a territory, that she would begin receiving for the first time a base salary equal to that of her peers – $400,000.

55. When Dr. Ekeruo began working in the north territory, as she feared, Hariharan's campaign of discrimination actively resumed.

56. Hariharan and those actively working in concert with him consistently blocked Plaintiff's efforts to build relationships with referring physicians and obtain privileges at the hospitals in the north territory.

57. Dr. Ekeruo herself, and through the clinic manager, submitted all the forms necessary for her to receive hospital privileges; however each time her forms were submitted, Hariharan and his confederates would claim that they did not receive the completed forms.

58. It was evident to the clinic manager and Dr. Ekeruo that Hariharan and his cohorts were continuing to sabotage and make life difficult for this distinguished black woman; they even failed to secure privileges for Dr. Ekeruo at one hospital.

59. Beginning in March 2018, it took Dr. Ekeruo nine months to secure her hospital privileges, and by contrast, it only took Dr. Naktal Hamoud, a newly hired out-of-state doctor, two months to receive his privileges. And in fact, Dr. Naktal Hamoud received his privileges months before Dr. Ekeruo actually received hers.

60. Now working – about August 2018 – in the north territory, Dr. Ekeruo inquired on the timing for her base salary increase. Unsurprisingly, Hariharan did not follow through with his promise to increase Dr. Ekeruo's base compensation.

61. This time, Hariharan cited budgetary issues and indicated that the department did not have the budget to pay Dr. Ekeruo a salary equal to her colleagues. Dr. Ekeruo did not embrace this falsehood.

62. Dr. Ekeruo then reminded Hariharan, about January 2019, that Dr. Sunil Reddy, in the west territory, had recently resigned making his salary available for Dr. Ekeruo to finally realize equal

pay. At this same time, Dr. Ekeruo requested to have clinic and establish an EP presence in Greater Heights which was another position previously held by Dr. Reddy

63. However, Hariharan refused and indicated that he was saving Dr. Reddy's position and salary for a white, male cardiac electrophysiology fellow named Dr. Brian Greet, who was scheduled to graduate from fellowship six months in the future.

64. This behavior was gross and offensive. For years, Dr. Ekeruo, an attending physician, had requested to be paid a fair salary, but was consistently refused and dismissed, and now Hariharan, the offender with the apparent support of the institutional Defendants, was ready to pay a white man who was yet to graduate from fellowship, a higher salary than her.

65. In addition to career sabotage, Hariharan regularly defamed and verbally abused Dr. Ekeruo.

66. On countless occasions, Hariharan reported lies and misleading information about her work performance and work relationships to several doctors across the University, and he frequently told Dr. Ekeruo and others that she was not "a team player." On information and belief, Hariharan used the term "team player" to signal that Plaintiff was not a fully compliant black woman.

67. Hariharan did this to tarnish Dr. Ekeruo's reputation and create bias against her in the minds of medical doctors and others.

68. Hariharan also consistently called Dr. Ekeruo angry, and he insisted that her colleagues feared her and did not like her.

69. These comments by him are fully in line with the "angry black woman" stereotype.

70. This stereotype is pervasive, and it is used to characterize black women as being more hostile, aggressive, and ill-tempered. However, this is a grossly unfair characterization of Dr. Ekeruo, her personality and her skill.

71. And when, during January 2019, Dr. Ekeruo sought appointment to an open position as Assistant Program Director for the EP Fellowship, Hariharan declared that because Dr. Ekeruo was so angry and disliked by her peers, that he would not ever support her for the position.

72. Hariharan's statements about Dr. Ekeruo were completely false; she was not angry, hostile, or disliked, but Dr. Hariharan and his confederates used his personal prejudice against black women to exclude Dr. Ekeruo from consideration for the position.

73. Unable to tolerate the persistent abuse and the lies Hariharan reported in Dr. Ekeruo's performance review, in April 2019, Dr. Ekeruo reported Hariharan's pattern of workplace misbehavior to Dr. Kevin Morano (Dean of Faculty Affairs); however, he summarily dismissed her complaints.

74. Shortly after reporting the mistreatment and discussing with Dr. Morano the workplace mistreatment that she was experiencing, Hariharan again retaliated against her and declared that he would no longer work with her.

75. He even declared that Dr. Ekeruo's status as a new mother made her less capable of performing her duties effectively.  He made this remark during June 2019.

76. At this point, Dr. Ekeruo was facing either termination or removal from Hariharan's department, and her removal from the department meant that she would be completely isolated from her EP peers.

77. Dr. Ekeruo was being punished by Hariharan and others for making complaints about unlawful discrimination in the workplace.

78. Drs. Giuseppe Colasurdo (University President) and Hariharan retaliated against Dr. Ekeruo and they jointly made the decision to remove Dr. Ekeruo from Hariharan's department, and reassign her to the cardiology department, which was led by McPherson.  This was done effective July 2019.

79. This new assignment resulted in a professional demotion for Dr. Ekeruo.

80. Firstly, Dr. Ekeruo was completely separated from her EP colleagues. She was now on an island by herself and had no one to provide her with coverage.

81. Secondly, her reassignment resulted in a myriad of administrative, billing, and scheduling issues that impacted the quality of service that she was able to provide to her patients.

82. Thirdly, Hariharan informed Dr. Ekeruo that since she was no longer in his department, that she would no longer be permitted to perform any EP medical procedures. He directed her to hand off all of her EP procedures to other medical doctors.

83. Hariharan knew that this directive would fatally impact Dr. Ekeruo's work RVU goals and her ability to stay credentialed because she was required to perform a certain number of medical procedures to remain credentialed. Moreover, the directive would forever harm and impair her standing in the medical community.

84. Moreover, McPherson began participating in the pattern of unlawful discrimination during July 2019 and prohibited Dr. Ekeruo from having a clinic in the Medical Center, which resulted in her losing a substantial number of patients, and he also prohibited her from accepting consults in Memorial Hermann Hospital.

85. No other medical doctors were treated this way by McPherson and his confederates, during this period of time.

86. Hariharan, and now, McPherson jointly were blocking and impairing Plaintiff's ability to practice medicine and her standing in the medical community.

87. Dr. Ekeruo protested and again complained to Dr. Colasurdo about her continued mistreatment and the crippling restrictions that were placed on her. This occurred during or about July 2019.

88. After several months of protest, Dr. Colasurdo gave Dr. Ekeruo permission to again begin performing EP procedures and permitted her to operate a clinic in Bellaire (not the Medical Center); however, McPherson again deliberately and intentionally placed stifling restrictions on her ability to operate this clinic.

89. McPherson only permitted her to operate the clinic two times per month with a maximum of 10 patients in each clinic, unlike others.

90. And in fact, several of Dr. Ekeruo's patients reported to her that when they called to schedule an appointment, they were told that Dr. Ekeruo was no longer employed with the University and were redirected to another doctor. This was more career-limiting sabotage.

91. By contrast, Dr. Ekeruo's peers, with the consent of McPherson, operated their clinics up to three times per week with no restrictions whatsoever on their number of patients.

92. Dr. Ekeruo continued during this period to receive disparate treatment, limitations on her advancement, and continued interference with her ability to practice medicine like her peers based on McPherson's sinister and racist tactics.

93. During the COVID-19 pandemic, medical procedures were limited for all doctors; however, despite these limitations, Dr. Ekeruo successfully met her yearly work RVU goals to "pay for her salary".

94. During this period, McPherson held a department-wide meeting and assured all the doctors that they would not be terminated due to the pandemic. Dr. Ekeruo attended this meeting.

95. However, days later, McPherson had a separate meeting alone with Dr. Ekeruo. During this meeting, he informed her that because of the COVID-19 pandemic, he had no budget to pay for her salary, and that he would be terminating her employment immediately.

96. Dr. Ekeruo rightfully challenged this because just days before, McPherson had publicly stated that no doctor would be terminated, and despite the pandemic, she had already met her yearly work RVU goals which paid for her salary in full.

97. McPherson stood firmly on his decision to terminate Dr. Ekeruo and warned her that if she told anyone about their conversation that "it would not be to [her] advantage".

98. Dr. Ekeruo, a black woman, knew that she was again being discriminated against, and now, she was being threatened. McPherson did not attempt to terminate or threaten Dr. Ekeruo's peers.

99. At this point, during 2020, Dr. Ekeruo again escalated her complaints of discrimination and retaliation.

100. She complained to Drs. Colasurdo, LaTanya Love, Margaret McNeese (Title IX Compliance), and Ms. Deana Moylan (EEO Compliance) about the mistreatment, inequity, threats, and hostility that she continued to experience.  These complaints were made during May and June of 2020 and it focused on the behavior of the individual Defendants and the institutional Defendants.

101. Her complaints were again summarily dismissed, on or about June 2020, and no bona fide investigation was ever conducted. These individuals failed to discharge their duties to the public and to the individual Defendants fully to investigate and remediate discrimination.

102. As the only black female, and well qualified, cardiac electrophysiologist in the entire State of Texas, Dr. Ekeruo was now keenly aware that racism and sexism was weaved into the fabric and culture of the University, and no one was going to intervene to protect her from it or stop it.

103. Now facing termination and a direct threat from McPherson, Dr. Ekeruo was backed into a corner.

104.     Dr. Ekeruo began experiencing intense stress, anxiety, and depression, and responsibly sought treatment from a therapist.

105.     A meeting was then held between Dr. Ekeruo and Drs. Colasurdo, Love, and B. Patel, and during this meeting Dr. Ekeruo had no choice but to agree to a 50% termination of her position at the University.   This meeting occurred on or about July 2020.

106.     This meant that she would now only be a part-time, employee and a substantial amount of her duties would be removed. She would no longer take calls, perform consults, or operate a clinic like her peers for the University.

107.     Instead, 50% of her time would be spent as a University employee where she would only be permitted to see patients at Lyndon B. Johnson Hospital, and the other 50% of her time would be spent forming a private practice under her own malpractice insurance to allow her to see patients and perform procedures without the discriminatory restrictions.

108.     Of note, in this meeting, it was agreed by Drs. Colasurdo, Love and Patel, that Dr. Ekeruo would perform any EP procedures at Memorial Hermann Texas Medical Center because Lyndon B. Johnson Hospital did not have a medical lab for her to perform the medical procedures.

109.     Hariharan and McPherson jointly had succeeded, based on racial animus and in conjunction with each other, in ousting Dr. Ekeruo. These two men jointly made Dr. Ekeruo's working environment so hostile and placed so many barriers in front of her that she knew she would be unable to successfully practice medicine as a full-time University employee. These two men confederated and conspired against Dr. Ekeruo, a black woman, to undermine and destroy her.

110.     Dr. Ekeruo worked under the part-time arrangement for about three years.  During this time, she was invited as Grand Rounds speaker for multiple departments in the University, in

fact so much so that the Chair of Anesthesia Services favorably wrote an email addressed to McPherson, Colasurdo and Smalling about her lectures. This occurred about February 2023.

111.    Dr. Ekeruo was invited to join educational leadership in the Internal Medicine Department as an Assistant Program Director. She was also invited to chair the educational committee of the Cardiology Fellowship and was an invited member of the research committee. This occurred from May 2022 – June 2023.

112.    She received multiple commendations for teaching, and because of all this, in September 2022, sought a promotion in rank.

113.    Dr. Ekeruo approached Drs. Morano, Love, and McPherson and advised them of her intent to apply for a promotion. They did not fully support her application and stated that they had instead expected her to resign from her position completely.

114.    They wanted jointly to drive her out of the University.

115.    Despite their lack of support, Dr. Ekeruo presented her application for promotion, during 2022.

116.    The internal review process completed by the various committees indicated that Dr. Ekeruo's background and achievements were superior and exceeded all expectations, and she actually was approved for promotion, effective September 2023.  This was done over the protests and objectives of McPherson, a racist.

117.    However, her promotion angered several University doctors, including the individual Defendants, because they did not want her to elevate; they instead wanted her to resign from the University.

118.    In response to this promotion, the institutional Defendants acting through their agents, again backed her into a corner, and ignited a renewed campaign to drive her out of the University.

119.     First, they rescinded Dr. Ekeruo's part-time work agreement and for the first-time said that the part-time work arrangement was a conflict of interest.   This occurred during November 2023.

120.     The University then indicated that Dr. Ekeruo either needed to completely resign from the University or revert to full-time status under the leadership of Hariharan, who still was a toxic racist. This was of course problematic given Hariharan's known prejudice against her.

121.     Reluctantly, Dr. Ekeruo agreed to revert back to full-time status; however, Hariharan predictably objected and again refused to work with this distinguished black woman.

122.     As a result, McPherson (with the support of Drs. Colasurdo, Hariharan, Morano, and members of the University Legal Department) indicated that he would be terminating Dr. Ekeruo's employment, effective September 1, 2024, and presented her with a notice of non-reappointment.

## CAUSES OF ACTION

### COUNT I

### (Race Discrimination in Violation of Section 1981)

123.     Plaintiff repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of the Complaint as fully set forth herein.

124.     Plaintiff is a member of a racial minority. Plaintiff is a black woman.

125.     Plaintiff alleges that Defendants jointly and severally have discriminated against her on the basis of her race (as described above) by treating her differently from and less preferably than similarly situated non-black employees and subjecting her to disparate terms and conditions of employment, pay that was unequal to her comparative non-black colleagues, hostile work environment, defamation, termination, and other forms of discrimination in violation of Section 1981. These unlawful activities include the individual Defendants.

126.     Defendants' conduct was intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

127.     As a proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

128.     As a proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## COUNT II

### (Race, Sex & National Origin Discrimination in Violation of Title VII)

129.     Plaintiff repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of the Complaint as fully set forth herein.

130.     Plaintiff is a member of three protected classes. Plaintiff is a black woman and a Nigerian American. She is Nigerian by birth; and she is American – US – by choice.

131.     Plaintiff alleges that UT Health Houston and UT System has discriminated against her on the basis of her race, sex, and national origin (as described above) by treating her differently from and less preferably than similarly situated non-black and non-Nigerian American employees and subjecting her to disparate terms and conditions of employment, pay that was unequal to her comparative male, non-black, and non-Nigerian American colleagues, hostile work environment, defamation, termination, and other forms of discrimination in violation of Title VII.

132.    The conduct of UT Health Houston and UT System was intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

133.    As a proximate result of the unlawful discriminatory conduct of UT Health Houston and UT System in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

134.    As a proximate result of unlawful discriminatory joint and several conduct of UT Health Houston and UT System – the institutional Defendants - in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## COUNT III

**(Pay Discrimination in Violation of Equal Pay Act)**

135.    Plaintiff repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

136.    UT Health Houston and UT System, jointly and severally, determined pay and other terms and conditions relevant to Plaintiff and her peers.

137.    UT Health Houston and UT System discriminated against Plaintiff by providing her with lower pay and other less favorable terms and conditions of employment than similarly situated male colleagues on the basis of her sex even though Plaintiff performed equal work, requiring equal skill, effort, and responsibility, under similar working conditions as her similarly situated male counterparts.

138.    The differential in pay between Plaintiff and her male colleagues were due to Plaintiff's sex.

139.    UT Health Houston and UT System, jointly and severally, caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on sex in violation of the EPA.

140.    The actions of UT Health Houston and UT System were not done in good faith, nor did either have any reasonable grounds for believing that its acts or omissions were not a violation of the Fair Labor Standards Act.

141.    As a result, Plaintiff is entitled to liquidated damages.

142.    The conduct of UT Health Houston and UT System, jointly or severally, was intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

143.    As a direct and proximate result of unlawful conduct of UT Health Houston and UT System in violation of the EPA, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost earning capacity, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

144.    As a direct and proximate result of  unlawful conduct of UT Health Houston and UT System in violation of the EPA, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

### COUNT V

**(Retaliation in Violation of Section 1981)**

145.     Plaintiff repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of the Complaint as fully set forth herein.

146.     Plaintiff is a member of a racial minority. Plaintiff is a black woman.

147.     Plaintiff alleges that Defendants, jointly or severally, retaliated against her for reporting and opposing race discrimination by subjecting her to unfavorable terms and conditions of employment, defamation, and terminating her employment.

148.     Defendants' conduct was intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

149.     As a proximate result of Defendants' joint and several unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

150.     As a proximate result of Defendants' (including that of the individual Defendants) unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## **COUNT V**

## **(Retaliation in Violation of Title VII)**

151.     Plaintiff repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of the Complaint as fully set forth herein.

152.     Plaintiff is a member of three protected classes. Plaintiff is black, Nigerian American, and is a woman.

153.     Plaintiff alleges that UT Health Houston and UT System retaliated against her for reporting and opposing discrimination by subjecting her to unfavorable terms and conditions of employment, defamation, and terminating her employment.

154.     The conduct of UT Health Houston and UT System was intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

155.     As a proximate result of the unlawful retaliatory conduct of UT Health Houston and UT System in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

156.     As a proximate result of the unlawful retaliatory conduct of UT Health Houston and UT System (the institutional Defendants) in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

A.     Declare that Defendants' employment policies, practices and/or procedures challenged herein are illegal and in violation of the EPA, Title VII, and Section 1981.

B.     Issue a permanent injunction against Defendants and their partners, officers, owners, agents, successors, employees, confederates, and representatives and any and all persons acting in concert with them, from engaging in any further unlawful discrimination and retaliation.

C.      Order Defendants to make Plaintiff whole by providing appropriate back pay, front pay, lost benefits, and prejudgment interest, in amounts to be determined at trial, and other affirmative relief as the Court finds fair, adequate and necessary.

D.       Order Defendants to make Plaintiff whole by providing compensation for past, present, and future pecuniary losses resulting from the unlawful discriminatory and retaliatory practices described above in amounts to be determined at trial.

E.      Order Defendants to make Plaintiff whole by providing compensation for non-pecuniary losses resulting from the unlawful discriminatory and retaliatory practices described above, including emotional pain and suffering, stress, anxiety, depression, loss of enjoyment of life, inconvenience, embarrassment, and humiliation, in amounts to be determined at trial.

F.      Order Defendants to pay Plaintiff punitive damages for its willful and malicious conduct in wanton disregard of Plaintiff's rights as described above, in an amount to be determined at trial.

G.      Award reasonable attorney's fees, interest and costs.

H.      Enter an order requiring Defendants to initiate, implement and maintain programs that (i) will provide equal employment opportunities for black employees, Nigerian American employees, and female employees; (ii) will remedy the effects of Defendants past and present unlawful discriminatory and retaliatory practices; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described.

I.      Enter an order establishing a task force on equality and fairness to determine the effectiveness of the program described in (H) above, which would provide for (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (H), above;

J.      Grant such other and further relief as the Court deems necessary and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all claims of relief and issues triable by jury.


                                        Respectfully submitted,


Dated: May 1, 2025                      /s/ Leslie N. Oguchi_____
                                        Leslie N. Oguchi
                                        Texas Bar No. 24081076
                                        5903 Serrano Terrace Lane
                                        Houston, Texas 77041
                                        Tel. (832) 454-6612
                                        Leslie.oguchi@oguchilaw.com

'                                       Oliver C. Mitchell, Jr.
                                        New York Bar No. 4486460
                                        101 Ellsworth Drive
                                        Sinking Spring, Pennsylvania 19608
                                        Tel. (248) 613-6315
                                        ocmitchelljr@aol.com

                                        *Attorneys for Plaintiff*